AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)  ☐ Original  ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

United States of America

v.

MICHAEL WILLIAMS,

Defendant.

Case No. 2:22-mj-00754-duty

FILED
CLERK, U.S. DISTRICT COURT
February 23, 2022
CENTRAL DISTRICT OF CALIFORNIA
BY: MR  DEPUTY

LODGED
CLERK, U.S. DISTRICT COURT
2/23/2022
CENTRAL DISTRICT OF CALIFORNIA
BY:   p   DEPUTY

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the dates of January 10, 2020, and August 4, 2020, in the county of Los Angeles in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 846 | Attempt to distribute methamphetamine |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
Complainant's signature

Leidy Partida, Special Agent
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: February 23, 2022

_____
Judge's signature

City and state: Los Angeles, California

Hon Pedro Castillo, U.S. Magistrate Judge
Printed name and title

AUSA: Jeremiah Levine

<u>AFFIDAVIT</u>

I, Leidy Partida, being duly sworn, declare and state as follows:

## I. <u>INTRODUCTION</u>

1. I am a Special Agent ("SA") for the Federal Bureau of Investigation ("FBI") and have been so employed since January 20, 2020. I am currently assigned to the Los Angeles Field Division Southern California Drug Task Force, High Intensity Drug Trafficking Area ("SCDTF-HIDTA"). SCDTF-HIDTA is a task force comprised of agents and officers from federal, state, and local agencies, assigned to investigate large-scale methamphetamine trafficking.

2. I have participated in the identification of members of drug trafficking organizations using telephone records and bills, photographs, and other documents. I have assisted in the handling of confidential sources, executed search warrants for controlled substances, and conducted physical and electronic surveillance in connection with drug investigations. Based on my experience and training with the FBI, I am familiar with the methods used in drug trafficking operations and the trafficking patterns employed by drug trafficking organizations. I know that drug traffickers often require the use of one or more telephone facilities to negotiate times, places, and schemes, for importing, manufacturing, and distributing controlled substances and for arranging the disposition of proceeds from the sale of controlled substances. The telephone enables drug traffickers to maintain contact with associates, suppliers, and customers. I also know that drug traffickers often use fraudulent information to subscribe to communication facilities, especially cellular telephones, and frequently change communications

facilities to thwart law enforcement efforts to intercept their communications.

## II. PURPOSE OF AFFIDAVIT

3.  This affidavit is made in support of a criminal complaint against and arrest warrant for Michael WILLIAMS ("WILLIAMS") for violations of 21 U.S.C. § 846 (attempt to distribute methamphetamine).

4.  This affidavit is also made in support of an application for a warrant to search the person of WILLIAMS, as described in Attachment A.

5.  The requested search warrant seeks authorization to seize evidence, fruits, and instrumentalities of violations of 21 U.S.C. § 846 (attempt to distribute methamphetamine and conspiracy to distribute methamphetamine); 49 U.S.C. § 46314(b)(1) (entering airport area in violation of security requirements); and 18 U.S.C. § 201 (b)(1) (bribery of public officials) (collectively, the "SUBJECT OFFENSES") as more fully described in Attachment B.  Attachments A and B are incorporated herein by reference.

6.  The facts set forth in this affidavit are based upon my personal observations and participation in this investigation, my review of material obtained via court authorized search warrants, information obtained from various law enforcement personnel and witnesses, and my training and experience.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not purport to set forth all my knowledge of, or investigation into, this matter.  Unless specifically indicated otherwise, all recordings, conversations and

statements described in this affidavit are related in substance and in part only.

### III. SUMMARY OF PROBABLE CAUSE

7. In August of 2019, law enforcement began investigating a drug trafficking organization ("DTO") transporting drugs from Los Angeles, California, to other parts of the United States, including Louisville, Kentucky.

8. On August 9, 2019, pursuant to a Kentucky state search warrant, law enforcement discovered and seized approximately 60 pounds of methamphetamine that were located within a shipping container sent from Los Angeles to Kentucky.

9. On August 12, 2019, two individuals were arrested in connection with the seized methamphetamine and one subsequently began cooperating with the related law enforcement investigation (the cooperating defendant is referred to hereinafter as "CD-1").[1] CD-1 provided information about the DTO's organization and activities, including the use of Transportation Security Officers ("TSOs") at the Los Angeles International Airport ("LAX") to help smuggle drugs past Transportation Security Administration ("TSA") security checkpoints at LAX.

10. On January 10, 2020, and August 4, 2020, federal agents and task force officers ("TFO") conducted undercover operations involving WILLIAMS, who was then a TSA TSO assigned to LAX. During the operation, WILLIAMS transported an unscreened package containing fake methamphetamine beyond the TSA security screening area at LAX

---

[1] CD-1 was charged with attempted distribution of a controlled substance in violation of 21 U.S.C. § 846. CD-1 has no previous criminal history. CD-1 is cooperating in exchange for sentencing considering and is not receiving financial compensation for cooperating.

and delivered the package to another individual (an undercover agent) in the sterile area of the airport in exchange for cash.

## IV. STATEMENT OF PROBABLE CAUSE

### A.   Kentucky Arrest and Indictment

11.  Based on my conversations with law enforcement agents in Kentucky, I know the following:

   a.   On August 9, 2019, a Kentucky state search warrant was executed on a shipping container belonging to CD-1.  Law enforcement officers recovered approximately 60 pounds of methamphetamine from the container.  The container was registered to CD-1, who was listed as both the shipper and the intended receiver.  The registration also included CD-1's cell phone number.  CD-1 was scheduled to retrieve the shipping container on August 12, 2019.

   b.   On August 12, 2019, at approximately 6:30 A.M., CD-1 was seen by law enforcement walking up to the shipping container and attempting to use a key to unlock it.  Law enforcement arrested CD-1 and conducted a search of CD-1 incident to CD-1's arrest.  Recovered from CD-1's person were keys that unlocked the original locks to both the shipping container and the pelican case recovered from inside the container.  Also recovered from CD-1's person was a black iPhone, which was later searched by law enforcement pursuant to a search warrant issued in Western District of Kentucky Case Number 3:19-MJ-597 by United States Magistrate Judge Regina S. Edwards.  On CD-1's cell phone, agents found a text message that conveyed to CD-1 the address and unit number for the storage unit and the gate code to access the unit.

   c.   CD-1 and CD-1's co-conspirator, Thomas Leo Porter, were subsequently indicted in Western District of Kentucky case

number 19-CR-160 on September 4, 2019 for their roles in a drug trafficking conspiracy.

    B.    <u>Identification of WILLIAMS</u>

    12.  On August 16, 2019, law enforcement obtained a federal warrant authorizing a search of CD-1's cellular telephone.

    13.  Based on agents' review of the materials obtained pursuant to the search warrant, I learned that:

        a.  The telephone number (310) 857-0218 was in contact with CD-1's telephone prior to CD-1's arrest; and

        b.  The telephone number (310) 857-0218 and CD-1's telephone used a cross-platform messaging and voice over IP service known as WhatsApp Messenger or simply WhatsApp, to send text messages and voice messages, make voice and video calls, and share images, documents, user locations, and other media.

    14.  Based on my training and experience, I know that drug traffickers use WhatsApp and other similar programs, for their enhanced privacy features, such as end-to-end encryption of messages.

    15.  Based on records subpoenaed from T-MOBILEUSA, I know that (310) 857-0218 was subscribed to "Michael Williams" at an address in Gardena, California.  I confirmed via a search of CLEAR[2] that WILLIAMS had previously lived at that Gardena address.

    16.  On February 22, 2022, I confirmed that WILLIAMS is still using (310) 857-0218 by dialing that number.  The person who answered responded "This is Michael."

---

    [2] CLEAR is a proprietary database that aggregates biographic information such as addresses, phone numbers, and Social Security numbers from databases available on the Internet.

17. Based on my review of WILLIAMS's TSA work schedule and his use of a TSA identity card at secure doors at LAX, I know that WILLIAMS was employed by the TSA as a TSO at LAX throughout 2019 and 2020.

C. CD-1's October 18, 2019, Proffer

18. On October 18, 2019, CD-1 participated in a proffer session with the government and provided, in substance and in part, the following statements:

    a. CD-1 would contact WILLIAMS and other TSA employees on FaceTime or WhatsApp to meet in person or to obtain their work schedule to coordinate for drug trafficking;

    b. CD-1 would then meet with WILLIAMS either the night before or the morning of his shift to hand over a backpack containing drugs;

    c. Once past the security checkpoints, WILLIAMS and a drug courier would meet in the bathroom to exchange the drugs;

D. January 10, 2020, Undercover Operation at LAX

19. On December 13, 2019, at the direction of SA Joelle Joseph, CD-1 asked WILLIAMS to help CD-1 smuggle methamphetamine past TSA security checkpoints at LAX. During these recorded text messages, WILLIAMS stated that he had not been working due to a lower back injury.

20. On January 6, 2020, WILLIAMS advised CD-1 of his return to work at LAX via a recorded text message. On January 7, 2020, via a recorded phone call, WILLIAMS advised his work schedule was Monday through Friday, Terminal four, starting at 12.

21. Between January 8, 2020, and January 9, 2020, via recorded telephonic conversations, WILLIAMS and CD-1 coordinated meeting

logistics, to include date, location, financial compensation, and parties involved. WILLIAMS stated he started work at 11 on January 10, 2020. CD-1 told Williams they could meet at a restaurant near William's work on January 10, 2020. During the meeting, CD-1 would provide WILLIAMS with a backpack that would contain the methamphetamine.

22. Unbeknownst to WILLIAMS, the methamphetamine provided to WILLIAMS by CD-1 were fake methamphetamine prepared by law enforcement. The fake methamphetamine consisted of a clear crystalline-like substance which appeared to be methamphetamine. Agents wrapped and sealed the fake methamphetamine to make it appear like real methamphetamine. WILLIAMS, who as a TSA agent had unscreened access to LAX, agreed with CD-1 to deliver the backpack to CD-1's accomplice in the men's restroom on the secure side of the airport terminal.

23. Based on my participation in this investigation, conversations with other law enforcement officers involved, review of images taken by airport security cameras at LAX, surveillance reports and the recorded conversations between CD-1 and WILLIAMS, I know the following about the activities of WILLIAMS on January 10, 2020:

24. At approximately 8:50 A.M., CD-1 and WILLIAMS agreed to meet at a restaurant in the vicinity of LAX ("LOCATION 1)".

25. At approximately 9:22 A.M., WILLIAMS told CD-1 he had arrived at LOCATION 1 in a Ford Flex and was next to a white Suburban. CD-1 told WILLIAMS he was going to get into WILLIAMS' vehicle.

26. At approximately 9:22 A.M., federal agents observed a dark grey Ford Flex ("VEHICLE 1") arrive at LOCATION 1. An open-source search revealed VEHICLE 1 was registered to WILLIAMS.

27. At approximately 9:23 A.M., federal agents observed CD-1 walking toward VEHICLE 1, carrying a dark-colored, weighted backpack. CD-1 subsequently entered the passenger side of VEHICLE 1.

28. At approximately 9:26 A.M., federal agents observed CD-1 exit VEHICLE 1, carrying the aforementioned backpack, now apparently less weighted.

29. At approximately 9:30 A.M., federal agents observed VEHICLE 1 departing the parking lot of LOCATION 1, traveling eastbound on Century Boulevard.

30. At approximately 10:22 A.M., a federal agent observed an FBI Agent acting in an undercover capacity ("UCE") at Gate 45 at Terminal 4 inside LAX ("LOCATION 2").

31. At approximately 11:36 A.M., federal agents observed WILLIAMS walk into the men's restroom in Terminal 4, across from the "Entertainment News" concession shop at LOCATION 2.

32. At approximately 11:39 A.M., federal agents observed UCE walking towards the same aforementioned restroom that WILLIAMS entered. Upon entering, UCE observed WILLIAMS standing in front of a sink. WILLIAMS was wearing earbuds and appeared to be talking on the phone. At this time, UCE made eye contact with WILLIAMS. WILLIAMS then turned and walked towards the restroom stalls. Looking east to west, WILLIAMS entered stall number 3 and gestured for UCE to go into adjoining stall number 2. Once inside the stalls, WILLIAMS, still talking on the phone, dropped a gray pillowcase containing the aforementioned fake methamphetamine.

After picking up the pillowcase and examining the contents, UCE dropped a Lays potato chip bag containing $4,000 cash as payment to WILLIAMS for his role in the transaction. Meanwhile, SA Velazquez entered the bathroom and observed that WILLIAMS and UCE in the bathroom stalls.

33. Shortly thereafter, WILLIAMS was observed on LAX closed-caption TV cameras exiting the restroom while wearing his TSA uniform and departing the area.

E. August 4, 2020, Undercover Operation at LAX

34. On July 29, 2020, at the direction of SA Joelle Joseph, CD-1 asked WILLIAMS to help CD-1 smuggle methamphetamine past TSA security checkpoints at LAX. During recorded calls, WILLIAMS stated that he would advise CD-1 of his work schedule for the upcoming week of August 2-8, once he received the schedule.

35. On August 3, 2020, WILLIAMS advised CD-1 (via recorded text message) of his current work schedule. WILLIAMS' shift on August 4, 2020, commenced at 12 P.M., and he was assigned to Terminal 4 at LAX. CD-1 and WILLIAMS coordinated to meet on August 4, 2020, via recorded text and phone conversations. WILLIAMS agreed to meet CD-1 at a predetermined location in the vicinity of LAX to receive methamphetamine from CD-1. During the meeting, CD-1 would provide WILLIAMS with a backpack that would contain the methamphetamine. Unbeknownst to WILLIAMS, the methamphetamine provided to WILLIAMS by CD-1 were fake methamphetamine prepared by law enforcement. The fake methamphetamine consisted of a clear crystalline-like substance which appeared to be methamphetamine. Agents wrapped and sealed the fake methamphetamine to make it appear like real methamphetamine. WILLIAMS agreed to walk the backpack

through a TSA checkpoint to which he had access without screening, and to deliver the backpack to CD-1's accomplice in the men's restroom on the secure side of the airport terminal.  The fake methamphetamine is pictured below.





36.   Based on my participation in this investigation, conversations with other law enforcement officers involved, review of images taken by airport security cameras at LAX, surveillance reports and the recorded conversations between CD-1 and WILLIAMS, I know the following about the activities of WILLIAMS on August 4, 2020:

37.   At approximately 9 A.M., CD-1 and WILLIAMS agreed to meet at a restaurant in the vicinity of LAX.

38.   At approximately 10:47 A.M, federal agents observed WILLIAMS arrive at a McDonald's restaurant near LAX driving a motorcycle ("LOCATION 3").

39. At approximately 10:57 A.M., federal agents observed WILLIAMS entering CD-1's vehicle, and exiting approximately two minutes afterwards.

40. At approximately 10:59 a.m., federal agents observed WILLIAMS get out of the CD-1's vehicle, get back on his motorcycle and drive out of the parking lot.

41. At approximately 11:04 A.M., federal agents observed WILLIAMS drive westbound on Century Blvd, enter LAX, and drive into Parking Garage 4 ("P4").

42. At approximately 11:09 A.M., a federal agent observed WILLIAMS use his cellphone in P4.

43. At approximately 11:20 A.M., federal agents observed WILLIAMS walk toward the Terminal 4 building entrance while wearing a blue TSA uniform shirt.

44. At approximately 11:27 A.M., a federal agent observed WILLIAMS enter the men's restroom in the vicinity of Gate 40.

45. At approximately 11:28 A.M., an FBI Agent, again acting in an undercover capacity ("UCE") entered the aforementioned men's restroom. Upon entering, UCE and WILLIAMS made eye contact, and WILLIAMS entered the first restroom stall ("stall 1"). UCE subsequently entered the neighboring restroom stall ("stall 2"). WILLIAMS placed a brown "Chipotle" food bag on the floor between the divider of stall 1 and stall 2. UCE then picked up the brown "Chipotle" bag and examined the fake methamphetamine. Then, UCE placed a "Lays" potato chip bag containing $4,000 in cash on the floor between the divider of stall 1 and stall 2. WILLIAMS subsequently picked up the "Lays" potato chip bag and departed the men's restroom. The $4,000 served as payment for WILLIAMS'

involvement in the transaction of fake methamphetamine. UCE departed the men's restroom shortly after WILLIAMS departed the restroom.

46. At approximately 11:31 A.M., WILLIAMS sent CD-1 a text message stating, "We good solid bro."

47. Based on a review of airport security cameras at LAX, I know that the UCE departed the area after the exchange in the men's restroom. Shortly thereafter, WILLIAMS was observed on LAX closed-caption TV cameras exiting the restroom while wearing his TSA uniform and departing the restroom area to begin his shift at screening in Terminal 4 of LAX.



## V. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[3]

48. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

    a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

    b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs

---

[3] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

        c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

        d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

49. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

        a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and

accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above. Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

      b. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

50. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

      a. Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

      b. In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number

of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

c. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress WILLIAMS's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of WILLIAMS face with his eyes open to activate the facial-, iris-, and/or retina-recognition feature.

d. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VI. CONCLUSION

51. For all the above reasons, there is probable cause to believe that WILLIAMS committed violations of the aforementioned 21 U.S.C. § 846 (attempt to distribute methamphetamine). There is also probable cause to believe that the items to be seized described in Attachment B related to the SUBJECT OFFENSES will be found in a search of WILLIAMS' person.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this  23rd  day of
February , 2022.

_____
HON. PEDRO V. CASTILLO,
UNITED STATES MAGISTRATE JUDGE